# IRMA ROGGE v. GREAT NORTHERN RAILWAY COMPANY.
## HERMAN ROGGE v. SAME.[1]

February 23, 1951.

Nos. 35,270, 35,271.

[1]Reported in 47 N. W. (2d) 475.

*Edwin C. Matthias, J. H. Mulally,* and *W. P. Westphal,* for appellant.

*English & Velta,* for respondents.

*William H. DeParcq* and *Donald T. Barbeau* filed a brief as *amici curiae* in support of the petition for rehearing.

LORING, CHIEF JUSTICE.

This appeal involves two actions against the Great Northern Railway Company to recover damages resulting from a grade-crossing collision between defendant's freight train and an automobile owned by plaintiff Herman Rogge and driven by his wife, Irma, the other plaintiff. She is claiming damages for personal injuries. He is claiming damages for loss of his wife's services, for medical expenses, and for damage done to his automobile. There was a verdict for plaintiff in each case. A motion for judgment notwithstanding the verdicts or a new trial was denied as to each case, and defendant is here on appeal from the orders denying its motion.

The collision, referred to above, occurred August 31, 1948, at approximately 6:30 p. m., at a point where defendant's track intersects a township road, approximately three-quarters of a mile south of Green Valley, Minnesota. The tracks run approximately north and south, and the road runs almost directly east and west, so that the angle northeast of the intersection is approximately 128 degrees. The automobile approached the crossing from the west and the train from the north. The crossing was an ordinary country grade crossing, protected by the customary cross-buck warning signs located 20 feet from the crossing on either side. At the time of the accident the sun was still shining, and it was a beautiful, clear day, according to Mrs. Rogge's testimony.

There is considerable dispute in the evidence as to the view that Mrs. Rogge had of the crossing at various points along the road. Plaintiffs' evidence consists principally of testimony, while defendant's evidence includes some testimony, several photographs of the

intersection, and a surveyor's diagram of the intersection showing elevations and linear distances.

The photographs introduced in evidence by defendant were taken at various distances west of the center of the intersection along the middle of the township road, where Mrs. Rogge claims to have been driving prior to the accident. At each point where a photograph was taken, the center of the camera lens was fixed by a tripod at an elevation of 4 feet, 2 inches, above the ground. This is approximately at the eye level of a driver sitting in an automobile. The camera was focused in a northerly direction when each picture was taken so that the camera would show the approximate view Mrs. Rogge would have had if she were looking in the direction from which the train approached the crossing. These photographs and the surveyor's diagram demonstrate that at a point 125 feet from the intersection a driver on the township road looking north could not see the track at all. At 100 feet, a driver might see the track to the north if he were looking carefully, and he could see the track to the south for approximately 3,000 feet. At 75 feet, there was an unobstructed view of the track to the north for at least 165 feet. At 60 feet, there was an unobstructed view of the track to the north for at least 1,040 feet, and defendant's depot in Green Valley, three-quarters of a mile away, was clearly visible. At 50 and 25 feet, the view remained approximately the same, increasing, if anything. It, of course, follows that, just as defendant's depot was visible at a greater distance than the track, defendant's orange-and-black diesel locomotive, 14 feet high, could be seen at greater distances than the track.

Opposed to this evidence is Mrs. Rogge's testimony. She testified that upon approaching the crossing she stopped approximately 100 feet from the track, shifted into low gear, looked, and listened. She testified that at that point she could not see any part of the track north of the crossing. This testimony is somewhat verified by the photograph taken at 100 feet from the track. Mrs. Rogge stated that she then drove the automobile in low gear the remaining 100 feet toward the crossing at a speed of approximately five miles per

hour and that she continued looking toward the north as she approached the crossing. Notwithstanding the careful and continuous lookout which Mrs. Rogge claims to have maintained, she testified that she was unable to see defendant's train until she was within ten feet of the crossing, and that at that time defendant's train was approximately 25 feet away. She turned the automobile to the right, hoping to avoid the collision, but she was unsuccessful.

Other pertinent evidence in these cases pertains to the nature of the terrain in the area of the crossing. Beginning at a point 100 feet west of the crossing, the road descends to the crossing at a little less than a three-percent grade. The road west of the crossing is cut through a hill, so that north of the road there is a bank, which plaintiffs' son Raymond estimated to be 3 or 4 feet high. However, this bank ends 50 feet from the crossing. Although plaintiffs' sons estimated that the bank extends to within 40 feet of the crossing, the measurement made with a steel tape by defendant's surveyor is obviously more accurate. It thus appears that anywhere within 50 feet of the crossing the bank did not obstruct Mrs. Rogge's view to the north.

Mrs. Rogge complained that high weeds obstructed her view to the north; that north of the road there were weeds which were just like trees and about 8 feet high. However, her husband and one of her sons testified that the weeds were about 4 or 5 feet high, while her other son testified that they were about 3 or 4 feet high. Defendant's photographer testified that the weeds came about up to his knees and were about 2 feet high. The photographs, taken with the center of the camera lens at an elevation of 4 feet, 2 inches, indicate that the weeds were not over 4 feet high. Defendant's photographs clearly show that neither the bank nor the weeds north of the road presented any obstruction to a driver's view of the track at any point along the highway within 60 feet of the crossing. Although plaintiffs claim that sightseers had trampled the weeds before the photographs were taken, the photographer testified that the weeds were not trampled and that the sightseers were gathered around the damaged car located southwest of the road rather than

in the area north of the road, where Mrs. Rogge claims her view was obstructed. A casual examination of the photographs themselves will show that the weeds were not trampled appreciably, if at all, at the time the pictures were taken.

■ We think that a review of the evidence outlined above demonstrates conclusively that Mrs. Rogge's estimate as to the height of the weeds was hyperbolic to say the least; that it is incredible that her view, at any point within 50 feet of the crossing, was obstructed by either the weeds or the contour of the land north of the highway; and that, accordingly, if Mrs. Rogge had looked to the north, as she claims, it is incredible that she did not see defendant's train until she was but 10 feet from the crossing. It appears to us that if she had been looking she must have had an unobstructed view of the track for at least 1,040 feet at any point within 50 feet of the crossing. By mathematical computation of speeds and distances, it appears that when Mrs. Rogge was within 50 feet of the crossing defendant's train was less than 480 feet from the crossing, and hence easily within her range of vision. These facts bring the present cases squarely within the rule of law which this court announced in Anderson v. G. N. Ry. Co. 147 Minn. 118, 120, 179 N. W. 687, 688:

"When the evidence conclusively shows that a colliding train must have been visible from the point where the traveler should have looked and listened, a conclusive presumption arises, either that he failed to look and listen, or else heedlessly disregarded the knowledge thus obtained and negligently encountered obvious danger."

This rule has been repeatedly followed in this state and has frequently been applied to facts similar to those in the cases at bar. In Carlson v. C. & N. W. Ry. Co. 96 Minn. 504, 105 N. W. 555, 4 L.R.A.(N.S.) 349, 113 A. S. R. 655, the driver's view in the direction from which the train approached was completely obstructed by a cornfield until he was within 50 feet of the crossing. Thereafter, his view was unobstructed for a distance of 2,500 feet, and the train was within his range of vision at the time. In Richter v.

C. R. I. & P. Ry. Co. 164 Minn. 284, 204 N. W. 881, the driver claimed that his view in the direction of the train's approach was obstructed by a growth of weeds and bushes—some of which were 5 feet in height—by some small trees ranging from 8 to 15 feet in height, and by steam, smoke, or mist. There, the court observed that plaintiff could easily have seen the train at any time after he was within 100 feet of the track, and hence deemed his view adequate to enable him to protect himself. In Anderson v. G. N. Ry. Co. 147 Minn. 118, 179 N. W. 687, trees and weeds obstructed the driver's view of the tracks up to a point 58 feet from the crossing. Thereafter, the driver had an unobstructed view of the tracks for a distance of 1,320 feet in the direction from which the train approached. In Jones v. G. N. Ry. Co. 178 Minn. 322, 227 N. W. 45, the driver, after reaching a point 43 feet from the point of collision, could see up the track in the direction of the train's approach for a distance of 1,130 feet. In Dahlquist v. M. & St. L. Ry. Co. 230 Minn. 203, 41 N. W. (2d) 587—the most recent case of this kind— the driver's view of the track in the direction of the train's approach was obstructed until he reached a point 40 feet from the crossing, and thereafter he could see for approximately 350 feet. In all of the above cases, the rule announced in the Anderson case was applied, and the automobile driver in each case was held contributorily negligent as a matter of law. The opinion in the Dahlquist case thus concisely summarized the basis of decision in all the cases cited above (230 Minn. 205, 41 N. W. [2d] 588) :

"* * * If the driver of the automobile involved in a collision with a train at a railroad crossing has an adequate opportunity under the surrounding circumstances to know of and see the approaching train in time to avoid the collision, he is guilty of contributory negligence as a matter of law."

Certainly, the Dahlquist case is controlling with reference to the present cases, for, if Mrs. Rogge had an unobstructed view of the track for a distance of 1,040 feet at any time after she was within 50 feet of the crossing, she must be deemed contributorily negligent,

as it was so held with reference to the motorist in the Dahlquist case, where the driver could see the track for a distance of only 350 feet when he was within 40 feet of the crossing.

■ If the obstructions to Mrs. Rogge's view at points more than 50 or 60 feet from the crossing demonstrate anything of significance, it is that she was obligated to use extra care in her approach to this crossing. In Rintala v. D. W. & P. Ry. Co. 159 Minn. 499, 505, 199 N. W. 562, 565, where plaintiff contended that his view was obstructed by cars on defendant's spur track, the court stated:

"Due care in general is somewhat a matter of relativity. That idea explains the use, in the law of negligence, of the phrase 'commensurate care.' So, whether in a given case there was a duty to stop in order to look and listen, must depend upon the circumstances. Certainly, obstructions to vision, such as the cars on the spur track in this case, do not excuse lack of care. Rather, they require extra care."

To the same effect are Richter v. C. R. I. & P. Ry. Co. 164 Minn. 284, 204 N. W. 881 (view obstructed by weeds, trees, and smoke or mist); Anderson v. G. N. Ry. Co. 147 Minn. 118, 179 N. W. 687 (view obstructed by weeds and trees); and Dahlquist v. M. & St. L. Ry. Co. 230 Minn. 203, 41 N. W. (2d) 587 (view obstructed by tool shed).

We have relied somewhat upon the photographs introduced in evidence by defendant in determining that defendant's train must have been within Mrs. Rogge's range of vision at any time after she was within 50 or 60 feet of the crossing, and we think that we are entitled to do so. Defendant's photographs in the present cases were not the kind of photographs referred to and rejected in N. P. Ry. Co. v. Spike (8 Cir.) 121 F. 44, 46, the case cited by plaintiffs. There, the court described the photographs as follows:

"The defendant's evidence consists chiefly of photographs taken under the supervision of its claim agent, which, it is claimed, show that at various points before the deceased reached the crossing he might have seen the headlight of the approaching train if he had turned and looked. But it is obvious enough *that these photographs*

*were taken only at the points from which the train could be seen, and not at any of the points along the road from which the train could not be seen,* and particularly was *no photograph taken from the point in the highway where it descends to and crosses the railroad track.* The photographs were *taken some time after the accident, and in daylight* [although the accident occurred at night], *and from points of view chosen by the defendant."* (Italics supplied.)

In the present cases, the accident occurred in daylight, and the photographs were taken in daylight. The photographs were not taken at points of view chosen by defendant, but were taken at regular 25-foot intervals on the highway as it descends to the railroad crossing. Care was taken to place the center of the camera lens at a level approximately the eye level of a driver on the highway. The photographs were taken the day following the accident. They were taken at points where the track could not be seen, as well as at points where it could be seen for short distances and for relatively long distances. It is apparent that these photographs were taken in a reasonably impartial and scientific manner.

■ Although we clearly must hold that Mrs. Rogge was contributorily negligent as a matter of law, the question arises whether Mrs. Rogge's contributory negligence is to be imputed to Mr. Rogge as a matter of law. In the present case, we think that the contributory negligence of Mrs. Rogge must be imputed to her husband. In this state, the common-law rule still prevails that the contributory negligence of an agent is imputed to the principal if it occurs while the agent is acting within the scope of his authority.[2] We think that agency is established as a matter of law by the admissions found in Mr. Rogge's own testimony. Mr. Rogge admitted that at the time of the accident his wife was driving to his place of employment to take him home from work; that he does not drive;

[2]Pearson v. Northland Transp. Co. 184 Minn. 560, 239 N. W. 602 (alternative holding) ; see, Christensen v. Hennepin Transp. Co. Inc. 215 Minn. 394, 407, 10 N. W. (2d) 406, 414, 147 A. L. R. 945; Jacobsen v. Dailey, 228 Minn. 201, 209, 36 N. W. (2d) 711, 716.

that his wife drives for him as his chauffeur; and that his wife makes trips of this nature at his direction and at times specified by him. The fact that there is no actual employment in terms of pay[3] or that the driver is a member of the car owner's immediate family[4] does not preclude the existence of an agency in cases of this nature; and, where the driver is performing a service to the owner at his request, numerous cases, both in this state[5] and elsewhere,[6] hold that agency is established.

Reversed with directions to enter judgment for defendant.

FRANK T. GALLAGHER, JUSTICE (dissenting).

I am compelled to disagree with the majority that we must clearly hold that plaintiff was guilty of negligence as a matter of law. It appears to me that the conflict in the testimony here as to the question of her contributory negligence was clearly one for the jury. It further appears from her testimony that she carefully approached the crossing, that she stopped her car, shifted it into low, looked around, and listened. She further testified that she did not hear a whistle of any engine coming from the north toward the crossing at that time, and she definitely said that no whistle was blown, nor was any bell rung. It seems to me from her testimony, taking into

---

[3]Ahlberg v. Griggs, 158 Minn. 11, 196 N. W. 652; Pearson v. Northland Transp. Co. 184 Minn. 560, 239 N. W. 602; Cannan v. Dupree (Tex. Civ. App.) 294 S. W. 298; Elliott v. O'Rourke, 40 R. I. 187, 100 A. 314; Prickett v. Whapples, 10 Cal. App. (2d) 701, 52 P. (2d) 972; Terry v. Smylie, 161 Miss. 31, 133 So. 662; Restatement, Agency, § 225, *comment a.*

[4]Pearson v. Northland Transp. Co. 184 Minn. 560, 239 N. W. 602. In Christensen v. Hennepin Transp. Co. Inc. 215 Minn. 394, 10 N. W. (2d) 406, the court clearly indicated that the existence or nonexistence of a family relationship is irrelevant in determining when contributory negligence of a driver is to be imputed to the car owner.

[5]Ahlberg v. Griggs, 158 Minn. 11, 196 N. W. 652; Pearson v. Northland Transp. Co. 184 Minn. 560, 239 N. W. 602 (alternative holding); see, Christensen v. Hennepin Transp. Co. Inc. 215 Minn. 394, 407, 10 N. W. (2d) 406, 414.

[6]Prickett v. Whapples, 10 Cal. App. (2d) 701, 52 P. (2d) 972; Cannan v. Dupree (Tex. Civ. App.) 294 S. W. 298; Elliott v. O'Rourke, 40 R. I. 187, 100 A. 314; Terry v. Smylie, 161 Miss. 31, 133 So. 662.

consideration all the surrounding circumstances and the speed and caution with which she approached the crossing, that the matter was clearly one for the jury to decide. It is true that the evidence here was such that it was possible for reasonable men to differ, but we have repeatedly said that it is only in the clearest of cases when the facts are undisputed and it is plain that all reasonable men can draw but one conclusion from them that the question of contributory negligence becomes one of law. Heikkinen v. Cashen, 183 Minn. 146, 148, 235 N. W. 879, 880, and cases cited. I cannot agree, under the record here, that this is such a case.

In view of my position in connection with the Irma Rogge case, it is unnecessary for me to comment on the Herman Rogge case.

### ON PETITION FOR REHEARING.

On April 20, 1951, the following opinion was filed:

LORING, CHIEF JUSTICE.

Plaintiffs have petitioned for a rehearing in these cases on the grounds that this court erred in holding (1) that Irma Rogge was guilty of contributory negligence as a matter of law, and (2) that her contributory negligence must be imputed to Herman Rogge as a matter of law.

On this petition for rehearing we have received briefs from all parties to the action, and, in addition, we have received an *amici curiae* brief on the phase of these cases which concerns the subject of imputed negligence. Having carefully examined the briefs submitted and having reëxamined our original opinion with particular reference to the objections raised in plaintiffs' petition for rehearing, we have decided that the petition must be denied. However, we have also decided that some further explanation of our original opinion may be warranted with respect to the matter of imputed negligence.

So far as Mr. Rogge's particular case is concerned, it is perfectly clear that he is not in a position to complain of the fact that his wife's contributory negligence was imputed to him. With reference to this matter the trial court instructed the jury as follows:

"* * * I might state to you that any negligence by Irma Rogge in this case in the operation of the car is imputed to her husband as he was the owner of the car and she was acting for his purposes in this case."

Plaintiffs did not object to the instruction. It is well settled that under such circumstances the trial court's charge, even though it be erroneous, becomes the law of the case for purposes of appeal. Farnham v. Pepper, 193 Minn. 222, 258 N. W. 293; Kane v. Locke, 218 Minn. 486, 16 N. W. (2d) 545, affirming Kane v. Locke, 216 Minn. 170, 12 N. W. (2d) 495; Christenson v. Village of Hibbing, 219 Minn. 141, 16 N. W. (2d) 881; Ellingboe v. Guerin, 228 Minn. 211, 36 N. W. (2d) 598.

In the Kane and Ellingboe cases, the problem presented was almost identical with that which is presented in the cases at bar. In both cases the trial court gave instructions on the subject of imputed negligence, and no objection to the charge was made. On appeal, this court held in both cases that an instruction to which no objection is made becomes the law of the case for the purposes of appeal, however erroneous it may be.

In any event, the trial court's instruction on the matter of imputed negligence was obviously correct. Mr. Rogge's own admissions on cross-examination clearly establish that at the time of this accident a master-servant relationship existed between Mr. and Mrs. Rogge with reference to the driving of Mr. Rogge's automobile. This master-servant relationship is not founded upon an agency imputed under the provisions of M. S. A. 170.54 (safety responsibility act), nor is it founded upon the now abandoned[7] "family-purpose doctrine." It rests instead upon a determination that the admitted facts conclusively establish the existence of an actual master-servant relationship. The correctness of this determination is nowhere more clearly demonstrated than in Mr. Rogge's testimony, which reads as follows:

---

[7] Jacobsen v. Dailey, 228 Minn. 201, 36 N. W. (2d) 711, 11 A. L. R. (2d) 1429; see, Ellingboe v. Guerin, 228 Minn. 211, 215, 36 N. W. (2d) 598, 600.

"Q. Have most of your jobs been in town or do you go out and paint out in the country?

"A. All over, out and around town.

"Q. You go out in the country and other places?

"A. All over in the county.

"Q. Does your wife usually drive you there on occasion?

"A. Yes, every day.

"Q. Do you yourself drive?

"A. No.

"Q. Does she drive for you?

"A. Yes.

"Q. She was kind of your chauffeur?

"A. Yes.

"Q. When you get to work in the morning, you let your wife know how late you are going to work and ask her to drop around and pick you up?

"A. Yes."

Although we should not attribute too much legal significance to Mr. Rogge's admission that his wife acts as his chauffeur, we think that his admissions as to the details of the arrangement between him and his wife clearly disclose that the word "chauffeur" accurately described Mrs. Rogge's status with reference to the driving of her husband's automobile. That the relationship between car owner and chauffeur is a classic example of the master-servant relationship can scarcely be disputed. The informality of the relationship, when it exists between husband and wife, should not be allowed to obscure the basic substance of the arrangement. In this day and age, it can hardly be said that a master-servant relationship is an inherent feature of the marriage relationship, and yet we think that it may be proved that a wife has acted as her husband's servant in a given instance, though it will not be presumed.

In the instant case, Mr. Rogge had furnished an automobile— a rather valuable instrumentality—to his wife so that she could transport him to and from his work. She drove all over the county

for the purpose of enabling him to carry on his occupation as a painter. It is clear that this was not an ephemeral or sporadic arrangement—a mere turn at the wheel, as plaintiffs choose to regard it. Since Mr. Rogge does not drive, he was wholly dependent upon the services of his wife as a chauffeur. The continuity of her services as a chauffeur is indicated by the fact that Mr. Rogge does not drive. The regularity and extent of her services are indicated by the fact that she took him to and from work every day. In brief, Mrs. Rogge regularly drove Mr. Rogge's car for his purposes. She made trips all over the county, the destination and time of travel being designated by Mr. Rogge. If he had employed a neighbor, a friend, or any nonrelative to serve him in this capacity, no one would contend that a master-servant relationship did not exist between them. We conclude that the admitted facts establish the existence of an actual master-servant relationship so clearly that no jury would be entitled to find otherwise.

Petition denied.

FRANK T. GALLAGHER, JUSTICE (concurring specially).

I concur in this opinion except in the question of the contributory negligence of Irma Rogge.